GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRY DEAN MYERS, an individual, on behalf of himself and those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JOHNSON HEALTH TECH RETAIL, INC.,<br><br>Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

INTRODUCTION .......... 1
THE PARTIES .......... 3
JURISDICTION AND VENUE .......... 3
RELATED ARBITRATION PROCEEDING AND TOLLING .......... 4
SUBSTANTIVE ALLEGATIONS .......... 5
A. Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. .......... 5
B. Defendant Falsely Informed Users That They Could Reject the Websites' Use of Non-Strictly Necessary Cookies and Opt-Out of the Sale of Personal Data. .......... 11
C. The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Websites. .......... 19
1. The Websites Cause the Interception of the Contents of Communications. .......... 19
2. Facebook Cookies. .......... 21
3. Google Cookies. .......... 26
4. Adobe Cookies. .......... 32
5. Salesforce Cookies. .......... 33
D. The Third Parties Intercept User Communications While in Transit. .......... 36
E. The Private Communications Collected are Valuable. .......... 40
PLAINTIFF'S EXPERIENCES .......... 41
CLASS ALLEGATIONS .......... 45
CAUSES OF ACTION .......... 47
First Cause of Action: Invasion of Privacy .......... 47
Second Cause of Action: Intrusion Upon Seclusion .......... 49
Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act ("CIPA") (California Penal Code § 631) .......... 51
Fourth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation .......... 54
Fifth Cause of Action: Unjust Enrichment .......... 58
PRAYER FOR RELIEF .......... 60

Plaintiff Terry Dean Myers ("Plaintiff") brings this action on behalf of himself, the general public, and all others similarly situated against Johnson Health Tech Retail, Inc. ("Defendant"). Plaintiff's allegations against Defendant are based on information and belief and the investigation of Plaintiff's counsel, except for allegations specifically pertaining to Plaintiff, which are based on his personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's websites (www.bowflex.com and www.schwinnfitness.com, each a "Website" and, collectively, the "Websites"), Defendant displays to them a popup cookie consent banner, which is substantially similar on each of the Websites. Defendant's cookie banner disclosed that the Websites use cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can elect to "Manage Cookies / Do Not Sell My Personal Information" by clicking or selecting a link to do so, as shown in the following screenshot (which has been stretched to enhance readability):[1]




2. Like most internet websites, Defendant designed the Websites to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that

---

[1] At some point after September 30, 2025, Defendant modified its cookie consent banner and/or cookie consent management platform on the Websites. Although the modified cookie consent banner continues to represent to Website visitors that they can reject certain categories of cookies and tracking technologies, Defendant continues to cause third-parties to intercept and collect Website users' Private Communications, including after users exercise their purported right to reject such cookies and tracking technologies. Thus, notwithstanding Defendant's modifications to its cookie consent banner and/or cookie consent management platform, Defendant continues to disregard Website users' express privacy choices and permit the unauthorized interception and collection of their Private Communications by third parties.

users could browse the Websites without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3. Even after users elect to "Manage Cookies / Do Not Sell My Personal Information" and reject all non-Strictly Necessary cookies, including Targeting and Performance cookies, and opt out of the sale of user data, Defendant nonetheless caused multiple third parties—including Meta Platforms, Inc. (facebook.com), Google LLC (www.google.com), Adobe Inc. (omtrdc.net), and Salesforce, Inc. (cquotient.com) (collectively, the "Third Parties")—to place and/or transmit cookies that tracked users' website browsing activities and enabled the Third Parties to intercept their private communications on the Websites (the "Third Parties").

4. Contrary to users' express rejection of cookies and tracking technologies on the Websites, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiff's and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding the Websites' visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles with unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Websites' visitors sought to avoid when they clicked or selected the "Manage Cookies / Do Not Sell My Personal Information" link on the Websites' cookie consent banner and subsequently rejected all non-Strictly Necessary cookies, including all Targeting and Performance cookies, and opted out of

the sale of user data on the Cookie Overview window that appears after a user clicks the "Manage Cookies / Do Not Sell My Personal Information" link. Defendant falsely told the Websites' users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiff and those similarly situated users of the Websites.

## THE PARTIES

7. Plaintiff Terry Dean Myers is, and was at all relevant times, an individual and resident of San Ramon, California. Plaintiff intends to remain in California and makes his permanent home there.

8. Defendant Johnson Health Tech Retail, Inc. is a Wisconsin corporation with its headquarters and principal place of business in Cottage Grove, Wisconsin.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiff and Defendant are citizens of different states.

10. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

11. Further, the private communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of California, including within this District.

13. Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

**RELATED ARBITRATION PROCEEDING AND TOLLING**

14. The delayed discovery rule applies to Plaintiff's and Class members' claims. Plaintiff and Class members were unaware that, despite rejecting all non-Strictly Necessary cookies (including all Targeting and Performance cookies) and opting out of the sale of user data on the Websites, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data. Plaintiff and Class members could not reasonably have discovered this conduct at the time of their visits to the Websites because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiff's or Class members' experiences on the Websites would have alerted a reasonable user that their selections were not being honored. Plaintiff lacked the technical expertise and specialized tools necessary to determine whether the Websites honored his opt-out selections or instead continued transmitting his data notwithstanding those selections, and he did not discover Defendant's conduct until a later investigation revealed it.

15. On or about September 30, 2025, Defendant was notified by Plaintiff's counsel that it was engaging in the conduct alleged herein, including causing third-party cookies and corresponding user data to be stored on consumers' devices and intercepted by third parties despite users' choice to reject and opt out of all non-Strictly Necessary cookies, including all Targeting and Performance cookies, and the sharing/selling of user information. Despite this notice, Defendant did not disclose this conduct to users.

16. The BowFlex Website's Terms of Use contain an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendant before the Judicial Arbitration and Mediation Services ("JAMS").

17. Accordingly, on November 14, 2025, Plaintiff filed a demand for arbitration in San Francisco with JAMS against Defendant. *See* Ex. A. Plaintiff asserted claims in the arbitration arising from the same conduct alleged herein.

18. On December 4, 2025, JAMS provided an invoice addressed to Defendant's Legal Department for the filing fee, stating the payment was due upon receipt. *See* Ex. B.

Pursuant to Cal. Civ. Proc. Code § 1281.98, Defendant's deadline to pay the arbitration fees was January 5, 2026. Defendant failed to pay the fees by the deadline.

19. On December 23, 2025, JAMS issued a final request for the filing fee from Defendant, advising Defendant that if its portion of the filing fee is not received within 30 days, JAMS will close the file and that, "California Code of Civil Procedure sections 1281.97 – 1281.99 may apply to the payment of fees for this arbitration." *See* Ex. C.

20. On January 27, 2026, JAMS closed the arbitration due to non-payment of arbitration filing fees from Defendant. *See* Ex. D.

21. Accordingly, Plaintiff may proceed in Court under Cal. Civ. Proc. Code § 1281.99.

22. Despite exercising reasonable diligence, Plaintiff was unaware of Defendant's conduct because Defendant affirmatively represented that users could reject all non-Strictly Necessary cookies, including all Targeting and Performance cookies, and opt out of the sale of user data, while simultaneously concealing that such tracking and sharing/selling would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiff from discovering his claims earlier. Further, Plaintiff's claims were equitably tolled by his demand letter and his filing of the arbitration proceeding because Defendant had notice of the claims (and his intent to pursue them in court as a putative class action). Defendant was not prejudiced in its ability to gather evidence for Plaintiff's and Class members' claims since their claims in this Complaint are substantially similar to those in Plaintiff's demand letter and his arbitration proceeding. These circumstances, including Defendant's concealment and misleading representations and Plaintiff's pursuit of the claims in the arbitration proceeding, warrant tolling of the statute of limitations.

## SUBSTANTIVE ALLEGATIONS

### A. Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.

23. Every website, including the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to

and from Internet users' browsers. For example, when a user clicks on a hyperlink on either of the Websites, the user's browser sends a "GET" request to that Website's server. The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website's server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website's server to identify the origin of the request and return the response.

24. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods. IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

25. As a result, Defendant knew or should have known that the devices used by Plaintiff and Class members to access the Websites were located in California.

26. Defendant voluntarily integrated "third-party resources" from the Third Parties into its Websites' programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant uses the third-party resources on the Websites pursuant to agreements between Defendant and the Third Parties.

27. The Websites cause users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website

to identify the device making the requests, and to record a session showing how the user interacts with the website.

28. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Websites' servers). First-party cookies are used to track users when they repeatedly visit the same website.

29. A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com, www.google.com, nautilus.tt.omtrdc.net). When the user's browser loads a webpage (such as a webpage of either of the Websites) containing embedded third-party resources, the third parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Websites) and across multiple browsing sessions.

30. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Websites are transmitted to those third parties, enabling them to surreptitiously track in real time and collect the Websites' users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a user of the Websites visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Websites;
- **Website Interactions:** Data on which links, buttons, or ads on the Websites a user clicks;
- **User Input Data**: The information the user entered into the Websites' form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with the Websites' content;
- **Interests and Preferences**: Insights into user interests based on the types of content viewed, products searched for, or topics engaged with on the Websites;
- **Shopping Behavior**: Information about the Websites' products viewed or added to shopping carts;
- **Device Information**: Details about a user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Websites;
- **Session Information**: Details about the user's current browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Websites during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific user of the Websites across different websites over time; and/or
- **Geolocation Data**: General location information based on the user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

31. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

32. Defendant manufactures, markets, and sells a wide variety of fitness equipment, including treadmills, exercise bikes, indoor cycling bikes, elliptical machines, home gyms, and strength-training equipment, under several brands, including BowFlex and Schwinn Fitness. Defendant owns and operates the Websites associated with these brands, which allow visitors to, among other things, obtain information regarding Defendant's fitness equipment and related products; browse and search for products; review product descriptions, features, specifications, and prices; compare different products and models; explore available accessories and product options; review customer ratings and reviews; learn about product warranties, financing options, and delivery services; access product support, assembly instructions, and owner's manuals; and purchase products. As users interact with the Websites—including by entering information into search fields and forms, searching for particular fitness equipment or accessories, browsing product categories and individual products, reviewing product features and specifications, comparing products and prices, selecting product options and accessories, reviewing financing and delivery information, adding products to shopping carts, entering information during the checkout process, clicking links, and making other selections—they transmit Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

33. Defendant chose to install or integrate its Websites with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Websites, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Websites, or that Defendant causes to be loaded. Because Defendant controls the Websites' software code, and is capable of determining whether a user is accessing the Websites from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

34. Defendant explains the third-party cookies it uses on the Websites as follows in its current Privacy Policy:

**INFORMATION WE COLLECT AUTOMATICALLY ONLINE**

> We and our third party business partners (including any third party service providers or third party content, advertising, and analytics providers) may use a variety of technologies, including cookies, web beacons, pixels, session replay software and other tracking technologies on our Sites and our mobile applications that automatically or passively collect information whenever you access or interact with the Service ("Usage Information"). For example, like many sites, we use technologies such as "cookies" and "clear gifs" to obtain certain types of information when your browser accesses our Service, or when you are provided the opportunity to complete surveys, participate in a sweepstakes or other incentives, or open or respond to any newsletter or other e-mail. We may also allow our business partners, including ad networks, to use these technologies to serve targeted advertisements, provide other advertising services and/or collect certain information when you visit the sites or utilize the Service. For additional information, please see the section below titled "Third Party Advertising and Analytics and Similar Third Parties".
>
> Usage Information may include the hardware model, browser, and operating system you are using, the URL or advertisement that referred you to the Service, the search terms you entered while using the Service, and all areas of the Service that you visit, including the products you view or search for, and your time zone, location information, and mobile network (if applicable), among other information. We may use Usage Information for a variety of purposes, including enhancing or otherwise improving the Service and our products and features. In addition, we may automatically collect your IP address or other unique identifier ("Device Identifier") for any computer, mobile phone, or other device you may use to access the Service. A Device Identifier is a number that is automatically assigned to your device used to access the Service.
>
> The methods used to collect Usage Information may include the following:
>
> - Cookies and Log Files. Cookies are small data files placed on a device when it is used to visit the Service or otherwise access our online content. Cookies may be used for many purposes, including, without limitation, remembering you and your preferences, tracking your visits to our web pages, and for displaying offers related to your prior activity on the Service. We may use both session and persistent cookies (which remain on your computer after the browser has been closed)…
>
> - Web Beacons. Small graphic images or other web programming code called web beacons (also known as "1x1 GIFs" or "clear GIFs") may be included in our web pages and email messages. Web beacons may be invisible to you, but any electronic image or other web programming code inserted into a web page or email can act as a web beacon. Web beacons or similar technologies may be used for a number of purposes, including, without limitation, to count visitors to the Service, to monitor how users navigate the Service, to count how many emails that were sent were actually opened or to count how many particular links were actually viewed.

- Embedded Scripts. An embedded script is programming code that is designed to collect information about your interactions with the Service, such as the links you click on. The code is temporarily downloaded onto your device from our web server or a third-party service provider, is active only while you are connected to the Service, and is deactivated or deleted thereafter.

In addition, we may use a variety of other technologies such as session replay software, pixels and other tracking technologies that collect Usage Information and similar information for security and fraud detection purposes and to enforce our intellectual property rights.

…

**THIRD PARTY ADVERTISING AND ANALYTICS COMPANIES AND SIMILAR THIRD PARTIES**

JHT works with third parties, such as analytics companies, network advertisers, ad agencies, and others who provide us with information about the Service, users, and our advertisements, and who serve our advertisements online. We and our third-party business partners collect certain information about your visits to and activity on our Service and other websites and services, including through the Social Media Features, and may use this information to target advertising to you and others and to assess the effectiveness of our advertising. We may also share (or permit third parties to collect) certain information, such as Usage Information, aggregated or de-identified or hashed information, with these third parties for similar purposes.

These third parties may set and access their own tracking technologies on your device (including cookies and web beacons) and may otherwise collect or have access to your personal information over time, including your visits to and activity on the site as well as other websites and online services.

Companies that we share information with, including ad networks, may use the information we provide to them, often in combination with their existing information, to provide you with more relevant advertising, and to help us and third parties do the same.

…

We also use Google Analytics, which uses cookies and other technologies to collect and analyze information about use of the site and provide other reports. This service may also collect information regarding your use of other websites, apps, and online resources.[2]

**B. Defendant Falsely Informed Users That They Could Reject the Websites' Use of Non-Strictly Necessary Cookies and Opt-Out of the Sale of Personal Data.**

35. When Plaintiff and other consumers in California visited the Websites, the Websites immediately displayed to them a popup cookie consent banner, which was substantially similar on each Website. As shown in the screenshot below, the cookie consent banner stated,

---

[2] BowFlex Website Privacy Policy (updated 1/14/2025) (available at https://www.bowflex.com/policies/privacy-policy) (the "Privacy Policy").

"This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners." The banner then purported to provide users the opportunity, rather than choose to "Accept Cookies," to instead "Manage Cookies / Do Not Sell My Personal Information," as shown in the following screenshot from the BowFlex Website (which has been stretched to enhance readability):




36. Plaintiff and other of the Websites' users who clicked or selected the "Manage Cookies / Do Not Sell My Personal Information" link were then directed to Defendant's "Cookie Overview" window. There, Defendant further represented, "When you visit our website, we store cookies on your browser to collect information. The information collected might relate to you, your preferences or your device, and is mostly used to make the site work as you expect it to and to provide personalized content, including ads. Below you can choose not to allow certain types of cookies, some of which may be 'sales' under California law. However, you cannot opt-out of our First Party Strictly Necessary Cookies as they are deployed in order to ensure the proper functioning of our website[.]" Accordingly, Defendant, through the Cookie Overview window, purported to provide users the option to either "Allow All" such cookies by clicking or selecting a button to do so, or to opt out of or reject all non-Strictly Necessary cookies, including Targeting and Performance cookies, as well as the sale of personal data, by adjusting the available toggle switches to do so, as shown in the following screenshots:


BOWFLEX
×
Cookie Overview
When you visit our website, we store cookies on your browser to collect information. The information collected might relate to you, your preferences or your device, and is mostly used to make the site work as you expect it to and to provide personalized content, including ads. Below you can choose not to allow certain types of cookies, some of which may be "sales" under California law. However, you cannot opt-out of our First Party Strictly Necessary Cookies as they are deployed in order to ensure the proper functioning of our website (such as prompting the cookie banner and remembering your settings, logging into your account, redirecting you when you log out, etc.). For more information about our privacy practices, please read our privacy policy.
Privacy Policy
Allow All
Manage Consent Preferences
+ Strictly Necessary Cookies
Always Active
+ Targeting Cookies / Sale of Personal Data
+ Performance Cookies
Confirm My Choices
Powered By CookiePro


BOWFLEX
×
Manage Consent Preferences
− Strictly Necessary Cookies
Always Active
These cookies are necessary for the website to function and cannot be switched off in our systems. They are usually only set in response to actions made by you which amount to a request for services, such as setting your privacy preferences, logging in or filling in forms. You can set your browser to block or alert you about these cookies, but some parts of the site may not work properly if blocked.
+ Targeting Cookies / Sale of Personal Data
+ Performance Cookies
Confirm My Choices
Powered By CookiePro


BOWFLEX
×
− Targeting Cookies / Sale of Personal Data
We may use certain third party cookies that collect information about your visits for analytics and to personalize your experience, including with targeted ads. Under certain circumstances, these may potentially be considered "sales" under the California Consumer Privacy Act (CCPA). Under the CCPA, consumers have the right to opt-out of the sale of personal information to third parties. You may opt out of the "sale" of personal information and from the use of targeting cookies on our website by turning off this toggle switch. If you use different computers or browsers, you may need to indicate your opt-out choices on each of those computers and browsers.
Targeting Cookies
These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of
Confirm My Choices
Powered By CookiePro







37. Users who adjusted the toggle switches associated with both "Targeting Cookies / Sale of Personal Data" and "Performance Cookies," thereby indicating their choice and/or agreement to reject all non-Strictly Necessary cookies in use on the Websites, including all Targeting and Performance cookies, and opt out of the sale of user data could then continue to browse the Websites after further selecting the "Confirm My Choices" button, as the popup cookie consent banner and Cookie Overview window disappeared.

38. Defendant's popup cookie consent banner and Cookie Overview window led Plaintiff, and all those users of the Websites similarly situated, to believe that they opted out of or rejected all non-Strictly Necessary cookies and tracking technologies, especially those that were used to "analyze performance and traffic on [the] [W]ebsite[s][,]" share users' personal information with Defendant's "social media, advertising and analytics partners[,]" and "provide personalized content, including ads." The banner and window further reasonably led Plaintiff and those users of the Websites similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Manage Cookies / Do Not Sell My Personal Information" link and adjusting the toggle switches

on the Cookie Overview window to opt out of the sale or sharing of user data and reject all non-Strictly Necessary cookies, including Targeting and Performance cookies.

39. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiff's or other users' wishes. When Plaintiff and other of the Websites' users clicked or selected the "Manage Cookies / Do Not Sell My Personal Information" link, and adjusted the toggle switches on the Cookie Overview window to reject all non-Strictly Necessary cookies and opt out of the sale of user data, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Websites.

40. Nevertheless, even after receiving that notice, Defendant caused third-party tracking cookies, including the Third Parties' cookies, to be placed on the Websites' users' browsers and devices and/or transmitted to the Third Parties, thereby enabling the Third Parties to collect user data in real time that discloses the Websites' visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiff tried to protect their privacy by rejecting all non-Strictly Necessary cookies and opting out of data sales, Defendant failed to prevent cookies from being transmitted to the Third Parties, enabling them to track user behavior and communications.

41. Some aspects of the operation of the Third Parties' cookies on the Websites can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following exemplar screenshots, obtained using one such tool, show examples of third-party cookies being transmitted from a BowFlex Website user's device and browser to Third Parties, even after the user clicked or selected the "Manage Cookies / Do Not Sell My Personal Information" link on the popup cookie consent banner, and adjusted the toggle switches on the Cookie Overview window to reject all non-Strictly Necessary cookies, including all Targeting and Performance cookies and opt out of the sale of user data:




| Name | Method | Domain | Cookies |
|---|---|---|---|
| s3603051781544?AQB=1&ndh=1&pf=1&t=16%2F8... | GET | telemetry.bowflex.com | 20 |
| anchor?ar=1&k=6LdYMaYUAAAAANznmiW20H5EN_... | GET | www.google.com | 7 |
| bframe?hl=en&v=44LqlOwVrGhp2lJ3fODa493O&k=6... | GET | www.google.com | 7 |
| anchor?ar=1&k=6LdYMaYUAAAAANznmiW20H5EN_... | GET | www.google.com | 7 |
| bframe?hl=en&v=44LqlOwVrGhp2lJ3fODa493O&k=6... | GET | www.google.com | 7 |
| bframe?hl=en&v=44LqlOwVrGhp2lJ3fODa493O&k=6... | GET | www.google.com | 7 |
| bframe?hl=en&v=44LqlOwVrGhp2lJ3fODa493O&k=6... | GET | www.google.com | 7 |
| anchor?ar=1&k=6LdYMaYUAAAAANznmiW20H5EN_... | GET | www.google.com | 7 |
| anchor?ar=1&k=6LdYMaYUAAAAANznmiW20H5EN_... | GET | www.google.com | 7 |
| reload?k=6LdYMaYUAAAAANznmiW20H5EN_dx2uK7j... | POST | www.google.com | 7 |
| reload?k=6LdYMaYUAAAAANznmiW20H5EN_dx2uK7j... | POST | www.google.com | 7 |
| reload?k=6LdYMaYUAAAAANznmiW20H5EN_dx2uK7j... | POST | www.google.com | 7 |
| reload?k=6LdYMaYUAAAAANznmiW20H5EN_dx2uK7j... | POST | www.google.com | 7 |
| trigger/?id=1022366139828528&ev=SubscribedButto... | GET | www.facebook.com | 6 |
| tr/?id=1022366139828528&ev=SubscribedButtonClic... | GET | www.facebook.com | 6 |
| trigger/?id=541906999587711&ev=SubscribedButton... | GET | www.facebook.com | 6 |
| tr/?id=541906999587711&ev=SubscribedButtonClick... | GET | www.facebook.com | 6 |
| trigger/?id=1022366139828528&ev=SubscribedButto... | GET | www.facebook.com | 6 |
| tr/?id=1022366139828528&ev=SubscribedButtonClic... | GET | www.facebook.com | 6 |
| trigger/?id=541906999587711&ev=SubscribedButton... | GET | www.facebook.com | 6 |
| tr/?id=541906999587711&ev=SubscribedButtonClick... | GET | www.facebook.com | 6 |
| trigger/?id=1022366139828528&ev=SubscribedButto... | GET | www.facebook.com | 6 |
| tr/?id=1022366139828528&ev=SubscribedButtonClic... | GET | www.facebook.com | 6 |
| trigger/?id=541906999587711&ev=SubscribedButton... | GET | www.facebook.com | 6 |
| tr/?id=541906999587711&ev=SubscribedButtonClick... | GET | www.facebook.com | 6 |
| json?mbox=pdp-view&mboxSession=e2100075349e4... | GET | nautilus.tt.omtrdc.net | 2 |
| json?mbox=NLS-global&mboxSession=e2100075349... | GET | nautilus.tt.omtrdc.net | 2 |
| json?mbox=NLS-global&mboxSession=e2100075349... | GET | nautilus.tt.omtrdc.net | 2 |
| json?mbox=NLS-global&mboxSession=e2100075349... | GET | nautilus.tt.omtrdc.net | 2 |
| json?mbox=pdp-view&mboxSession=e2100075349e4... | GET | nautilus.tt.omtrdc.net | 2 |
| json?mbox=NLS-global&mboxSession=e2100075349... | GET | nautilus.tt.omtrdc.net | 2 |
| ant_squire | POST | d-ipv4.mmapiws.com | 1 |
| ant_squire | POST | d-ipv6.mmapiws.com | 1 |
| promotional-info | POST | api.chargeafter.com | 1 |
| logo.svg | GET | cdn.chargeafter.com | 1 |

748 requests | 7.9 MB transferred | 45.0 MB resources | Finish: 32.65 s | DOMContentLoaded: 358 ms | Load: 97




| Name | Method | Domain | Cookies |
|---|---|---|---|
| ant_squire | POST | d-ipv4.mmapiws.com | 1 |
| ant_squire | POST | d-ipv6.mmapiws.com | 1 |
| promotional-info | POST | api.chargeafter.com | 1 |
| logo.svg | GET | cdn.chargeafter.com | 1 |
| promotional-info | POST | api.chargeafter.com | 1 |
| pebble?tla=aayw-bowflex&activityType=viewProduct... | GET | p.cquotient.com | 1 |
| pixel?ownerId=3613&eventId=visit_product_bowflex... | GET | ag.innovid.com | 1 |
| chargeafter.min.js?t=1.758061894918E12 | GET | cdn.chargeafter.com | 1 |
| 1758061848879 | GET | rtr.innovid.com | 1 |
| pebble?tla=aayw-bowflex&activityType=viewSearch&... | GET | p.cquotient.com | 1 |
| tag.js?d=inv_data&cb=1758061848846 | GET | s-static.innovid.com | 1 |
| chargeafter.min.js?t=1.758061848401E12 | GET | cdn.chargeafter.com | 1 |
| pebble?tla=aayw-bowflex&activityType=viewPage&c... | GET | p.cquotient.com | 1 |
| 1758061840997 | GET | rtr.innovid.com | 1 |
| tag.js?d=inv_data&cb=1758061840941 | GET | s-static.innovid.com | 1 |
| chargeafter.min.js?t=1.758046032138E12 | GET | cdn.chargeafter.com | 1 |
| ant_squire | POST | d-ipv4.mmapiws.com | 1 |
| ant_squire | POST | d-ipv6.mmapiws.com | 1 |
| logo.svg | GET | cdn.chargeafter.com | 1 |
| promotional-info | POST | api.chargeafter.com | 1 |
| pebble?tla=aayw-bowflex&activityType=viewProduct... | GET | p.cquotient.com | 1 |
| pixel?ownerId=3613&eventId=visit_product_bowflex... | GET | ag.innovid.com | 1 |
| lube-n-walk-kit-93067.png?sw=1200&sh=800&sm=fit | GET | edge.disstg.commercecloud.salesf... | 1 |
| poweredBy_cp_logo.svg | GET | cookie-cdn.cookiepro.com | 1 |
| bowflex-logo.png | GET | cookie-cdn.cookiepro.com | 1 |
| webworker.js?hl=en&v=44LqlOwVrGhp2lJ3fODa49... | GET | www.google.com | 0 |

42. The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.bowflex.com.[3] The screenshots depict only network traffic occurring ***after*** the user

[3] The Schwinn Fitness Website, available at www.schwinnfitness.com, exhibited similar behavior in the use and placement of unwanted cookies, despite users' choices to the contrary.

opted out of data sales or sharing and rejected all such cookies using the toggle switches available on the Cookie Overview window.

43. As shown above, despite the user's rejection of all non-Strictly Necessary cookies, the user's interactions with the BowFlex Website resulted in the user's browser making a large number of GET and POST HTTP requests to third-party web domains like www.facebook.com, www.google.com, nautilus.tt.omtrdc.net, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers rejected all non-Strictly Necessary cookies and tracking technologies and opted out of data sales or sharing by clicking or selecting the "Manage Cookies / Do Not Sell My Personal Information" link and adjusting the toggle switches on the Cookie Overview window. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all non-Strictly Necessary cookies.

44. Plaintiff's and other users' Private Communications with the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

45. As users interact with the Websites, even after adjusting the toggle switches on the Cookie Overview window to opt out of or reject all non-Strictly Necessary cookies, more data regarding users' behavior and communications are intercepted by the Third Parties alongside the cookie data. This occurs despite users' rejection of cookies and similar technologies for personalized content, advertising, performance and traffic analytics, and the sale or sharing of personal information with third parties for such purposes. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Websites. Because

third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

46. The Third Parties' code that the Websites cause to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on the Websites' users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

## C. The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Websites.[4]

### 1. The Websites Cause the Interception of the Contents of Communications.

47. The Websites include search bars and other input fields through which users enter information. For example, below is a screenshot of a search bar currently available on the BowFlex Website, where users can type into the search box to cause the BowFlex Website to search its contents. The search bar allows users to search Defendant's fitness products.

[4] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had adjusted the toggle switches on the Cookie Overview window to reject and opt out of the sale of user data and all non-Strictly Necessary cookies, including all Targeting and Performance cookies.




48. The Schwinn Fitness Website includes similar search and input fields. For example, the following screenshot shows a field in which users can input location information to find nearby retailers:




49. When users input the information into these search fields, they intend to communicate the contents of their searches directly to the Websites.

50. Instead, Defendant programmed the Websites such that the contents of those communications are transmitted to, and intercepted by, the Third Parties while the communications are in transit between users' browsers and the Websites.

51. For example, as shown in the screenshot below, the BowFlex Website causes users' search queries to be transmitted to third parties, including Adobe, even after users have opted out of or rejected all non-Strictly Necessary cookies. When a user submits a search, the BowFlex Website loads a results page that includes the user's query in the URL. The BowFlex

Website then transmits that URL to third parties, thereby disclosing the full search query to those parties. For instance, a test search string ("privacy matters") was transmitted to Adobe's nautilus.tt.omtrdc.net domain, along with associated identifiers and metadata:







**2. Facebook Cookies.**

52. Defendant also causes third-party cookies to be transmitted between its Websites' users' browsers and devices and the **www.facebook.com** domain, even after users elect to reject all non-Strictly Necessary cookies, including all Targeting and Performance cookies and opt out of the sale of user data. This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[5] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

[5] Meta Cookies Policy (available at https://www.facebook.com/privacy/policies/cookies/).

53. Meta's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Website causes the following type of data to be sent to Meta when a user clicks on a button on the Website:



GET

200

https://www.facebook.com/privacy_sandbox/pixel/registe
l=https%3A%2F%2Fwww.bowflex.com%2F&rl=&if=false&ts=175
-sqr%20btn-tri-dark%20h-ghost%22%2C%22destination%22%3
l%2FBTM0011-01.html%22%2C%22id%22%3A%22%22%2C%22imageU
numChildButtons%22%3A0%2C%22tag%22%3A%22a%22%2C%22type
0Now&cd[formFeatures]=%5B%5D&cd[pageFeatures]=%7B%22ti
ikes%2C%20Home%20Gyms%2C%20Treadmills%20%7C%20BowFlex%
fbp=fb.1.1758061717671.2414459872076020&ler=empty&cdl=
oo=false&es=automatic&tm=3&expv2%5B%5D=pl0&expv2%5B%5D

**Request** Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| | tons"%3A0%2C"tag"%3A"a"%2C"type"%3Anull%2C"name"%3A""%7D |
| cd[buttonText] | Shop%20Now |
| cd[formFeatures] | %5B%5D |
| cd[pageFeatures] | %7B"title"%3A"BowFlex%20Home%20Exercise%20Equipment%20-%20Bikes%2C%20Home%20Gyms%2C%20Treadmills%20%7C%20BowFlex%20"%7D |
| cdl | API_unavailable |
| coo | false |
| dl | https%3A%2F%2Fwww.bowflex.com%2F |
| ec | 3 |
| es | automatic |
| ev | SubscribedButtonClick |
| expv2%5B%5D | pl0 |
| expv2%5B%5D | el2 |
| expv2%5B%5D | bc3 |
| expv2c | pl0_el2_bc3 |
| fbp | fb.1.1758061717671.2414459872076020 |
| id | 1022366139828528 |
| if | false |
| it | 1758061717614 |
| ler | empty |
| o | 12318 |
| plt | 1012.7000000476837 |
| r | stable |
| rl | |
| rqm | FGET |
| sh | 1080 |
| sw | 1920 |
| tm | 3 |
| ts | 1758061777006 |
| v | 2.9.230 |




54. The "ev" parameter is short for "event." In this instance, the event is a "SubscribedButtonClick," which occurs when a user clicks a button on the Website.

55. The "dl" parameter is the "Document Location." It tells Facebook the specific webpage on which the event occurred.

56. The "ts" parameter corresponds to a "Timestamp," and tells Facebook the exact time—down to the millisecond—at which the event occurred.

57. The "fbp" parameter is the Facebook Browser ID, and is used to track the user's activity across the Internet.

58. The "sw" and "sh" parameters stand for "screen width" and "screen height," and correspond to the display the user was viewing when the event was recorded

59. The "c_user" cookie shown above enables Meta to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Meta to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking

"Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Meta uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience. Cookies enable Meta "to understand the information that [Meta] receive[s] about [users], including information about [user's] use of other websites and apps, whether or not [users] are registered or logged in."[6]

60. In addition, the "user-agent" header is sent to Facebook even after the user rejects all non-Strictly Necessary cookies on the Website. The user-agent header discloses to Facebook the user's device, operating system, and browser.

61. Further, the user's IP address is sent to Facebook, further enabling it to track the user and to determine the user's geolocation.

62. In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies allow Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[7] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[8]

63. The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses, which can be used to determine whether a user is located in California).[9]

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] Meta Cookies Policy (available at https://www.facebook.com/privacy/policies/cookies); Meta Privacy Policy (available at https://www.facebook.com/privacy/policy/); Customer Information Parameters (available at https://developers.facebook.com/documentation/ads-commerce/conversions-api/parameters/customer-information-parameters); Advanced matching – Meta Pixel (available at https://developers.facebook.com/documentation/meta-

64. Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) Ad Targeting and Retargeting, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. Meta also states that "other companies' cookies help tailor ads off of Meta Products, measure their performance and effectiveness and support marketing and analytics."[10] The resulting profile enables Meta to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) Conversion Tracking, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) Audience Insights and Analytics, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) Cross-Device and Cross-Platform Tracking, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

**3. Google Cookies.**

65. Defendant causes third-party cookies to be transmitted between its Websites' users' browsers and devices and the **www.google.com** domain, even after users reject all non-Strictly Necessary cookies, including all Targeting and Performance cookies, and opt out of the sale of user data.[11] This domain is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[12] The Websites' users' browsers

---

pixel/advanced/advanced-matching); https://allaboutcookies.org/what-data-does-facebook-collect.

[10] Meta Cookies Policy (available at https://www.facebook.com/privacy/policies/cookies/).
[11] *See* Advertising (available at https://policies.google.com/technologies/ads).
[12] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

automatically send Google their page URL and IP address.[13] Further, the Websites permit Google to set cookies on the Websites' users' browsers and read cookies that are already there.[14] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[15] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies enable its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[16]

66. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[17] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead."[18] As Google explains, "Google Marketing

[13] *See* How Google uses information from sites or apps that use our services (available at https://policies.google.com/technologies/partner-sites).
[14] *Id.*
[15] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.
[16] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=11962135750754589O8-NC).
[17] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=11962135750754589O8-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).
[18] *Id.*

Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers."[19]

67. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from … websites and apps to create reports that provide insights into … business[es]."[20] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, … makes a purchase;" "completes a purchase"; "searches … website or app"; "select content on … website or app"; "views an item"; and "views their shopping cart."[21]

68. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data, including whether a user is located in California.[22]

---

[19] *Id.*

[20] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

[21] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events by business vertical (available at https://developers.google.com/analytics/devguides/collection/ga4/reference/recommended-events?vertical=retail).

[22] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

69. Google's own Privacy & Terms materials states that "[w]e store a record of the ads we serve in our logs."[23] "These server logs typically include your web request, IP address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser or, if you are signed-in, that may uniquely identify you."[24] Google then uses location information to infer the Websites' users' demographic information.[25]

70. For example, the Google software code that Defendant causes to be stored on and executed by the Websites' user's device causes the following cookie data to be sent to Google's domain, at google.com:




[23] *See* Advertising (available at https://policies.google.com/technologies/ads?hl=en).
[24] *Id.*
[25] *Id.*

| | |
|---|---|
| NID | 525=gTR3_oLxHyaNYDlPNM8oXUiMS27FVo9CZVok9FaWm4OFuQrNlrQNx5JLeok3UY5rRXcpCCGRsvDmZTza1Y--swtoAvjKB4iMtw_GVKVOJSEZK45I62TW11PXixxYxroa_O3wwj-LaKQagCsaewPUb4GJlH4z9RhFCQEpHqY-10eWPUr0W-PFA8SJGB62sKab9Ael1z4nvpnN0mfkdZ88NpzcyMeeOB2O9PZDJqb-z9xkiHJatal61nXZWtrT2js_2FSS4RlmC5ekV9IxyU2cPPjVq8BmzKFXHo0j55OClBXu6DpZ6GZheKm2F5qaSt_o7EX41HcoErdlygnk-DVbuUPSJQNc8zSaEUx46bIf-c9fJdj3jdu9yaMC_qnBX3tH8R4Ulaa4fNyUa7kR0Syzn7Tzny1BZH2_E1oCHznJllXfCGXaSzTazgUdx_KSU2UA1Fg0bKkdfUXafgdAlpEs_154Vs9j-vJH1EEEzFRbSO8EFq--9qB5b1lBJF8GrBDxfl1qGN1UxUVmNbRPDP_DTe1KvHWWpTPr8eFJNvPBPnlh4MQg9EDE3WWCgFf_VfZpDYk6Fn_4YNHa138KC38nlNG-MyS8bvr7Y94IG92pZfddh6mPjZNczsADcMVxNAyZwlaFSDNwvpBpRZzSOAyluQnbPSCSE8E5-OV4ZsjTFd5nYJ0a5uahiBsAJPSSDiFOJGWNpi77vA2O9nQ1BXAGLZ-Mz66rWj_SsSuniKvzz6XXSf7Qy1V5ZfZC6fZs9uXXwERrEfVkI5K4UBnOU52PBedRv9qJVH3bmLCQkPLKNBgeXGj6g2yJBepGK5keALqF3hLm0oKCXtZL93g3vUQu_dYB5D81RFR3MHQ4b3s5llojfoZscjbtcTFzCvE-JTEdeOo2J43D9VfiLIrAlU4vwlG36e9gkPmvqa0xVkYSYKEdvLeUEYfPkAzVXsk_CMPxAT39KswB0LMehhlMlVU2Cq81dQktJntygHdAoOCd3n8veXvWtVel28dX09SVpFxUTI7P58ePeNyX_dJfB_U |

71. The "NID" cookie is used for Google advertising. According to Google documentation, "[t]he 'NID' cookie is used to show Google ads in Google services for signed-out users," and "expires 6 months after a user's last use."[26]

72. In addition, the Google software code that Defendants cause to be stored on and executed by the user's device causes the user's "user-agent" header and IP address to be sent to Google. As discussed above with respect to Facebook, that data discloses to Google the user's device, operating system, and browser, and further enables Google to geolocate and track the user.

73. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie enables Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google states that when users visit sites or apps using Google's ad or analytics services, "those services may link information about your activity from that site or app with activity from other sites or apps that use our services."[27] Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience

---

[26] https://policies.google.com/technologies/cookies?hl=en-US.

[27] *See* Why Google collects data (available at https://policies.google.com/privacy?fg=1&hl=en-GB).

segments based on shared traits (such as females, Millennials), and to perform targeted advertising and marketing analytics.

74. Google's consumer profiles span across the user's devices and across households.[28] Google states that it "may infer whether activity from different devices, browsing sessions, or accounts is associated," and links mobile advertising IDs to advertising cookies "to coordinate ads across [users'] mobile apps and mobile browser."[29] Users may then receive ads on household connected TVs related to the web or app activity from devices within their household.[30]

75. Thus, the Google cookies used on the Websites enable Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show the user more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[31] Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for

---

[28] *See* Advertising (available at https://policies.google.com/technologies/ads?hl=en).
[29] *Id.*
[30] *Id.*
[31] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[32] Thus, Google has the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**4. Adobe Cookies.**

76. Defendant also causes third-party cookies to be transmitted between its Websites' users' browsers and devices and the **omtrdc.net** domain, even after users elect to reject all non-Strictly Necessary cookies, including all Targeting and Performance cookies, and opt out of the sale of user data. This domain is associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service which provides a universal, persistent ID to identify visitors across all Adobe products.

77. These cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[33] These cookies enable Adobe to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[34]

78. Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and

---

[32] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[33] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).

[34] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

demographics, create audience segments based on shared traits (such as Millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[35] Adobe is able to do this because Adobe's Visitor ID Service receives aliases and ID mappings from customers and partners and "[s]upports ID synchronization with different third parties across the ad tech ecosystem."[36]

79. For example, the Adobe software code that Defendant causes to be stored on and executed by the Websites' users' devices causes the following data to be sent to Adobe's domain, at omtrdc.net:

[35] *See, e.g.*, Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

[36] Adobe Visitor ID Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview).

GET
200

https://nautilus.tt.omtrdc.net/m2/nautilus/mbox/json?m
&mboxPC=e2100075349e4dfe923044029bf65f90.35_0&mboxPage
dbb0fe20e781e4703&mboxVersion=1.8.3&mboxCount=2&mboxTi
A%2F%2Fwww.bowflex.com%2Fproduct%2Fvelocore-22-exercis
ex.com%2Fsearch%3Fq%3Dprivacy%2Bmatters&mboxXDomain=en
t=-420&screenHeight=1080&screenWidth=1920&colorDepth=2
derer=ANGLE%20%28NVIDIA%2C%20NVIDIA%20GeForce%20RTX%20
_0%2C%20D3D11%29&mboxMCSDID=6245F968E01F1520-1547E083B
17300723433543012111281921118217748&mboxAAMB=RKhpRz8krg

Request Header **Query** Body Cookies Raw Summary +

| Key | Value |
| --- | --- |
| browserHeight | 930 |
| browserTimeOffset | -420 |
| browserWidth | 334 |
| colorDepth | 24 |
| devicePixelRatio | 1 |
| mbox | pdp-view |
| mboxAAMB | RKhpRz8krg2tLO6pguXWp5olkAcUniQYPHaMWWgdJ3xzPWQ mdj0y |
| mboxCount | 2 |
| mboxHost | www.bowflex.com |
| mboxMCGLH | 9 |
| mboxMCGVID | 83481730072343354301211128192111821774 |
| mboxMCSDID | 6245F968E01F1520-1547E083B17FE3E2 |
| mboxPage | 0b42db4c394345d8baddad09f4d2d26b |
| mboxPC | e2100075349e4dfe923044029bf65f90.35_0 |
| mboxReferrer | https://www.bowflex.com/search?q=privacy+matters |
| mboxRid | f131e31b09504dadbb0fe20e781e4703 |
| mboxSession | e2100075349e4dfe923044029bf65f90 |
| mboxTime | 1758036695428 |
| mboxURL | https://www.bowflex.com/product/velocore-22-exercise-bike/ 100914.html |
| mboxVersion | 1.8.3 |
| mboxXDomain | enabled |
| screenHeight | 1080 |
| screenOrientation | landscape |
| screenWidth | 1920 |
| vst.trk | nautilus.d2.sc.omtrdc.net |
| webGLRenderer | ANGLE (NVIDIA, NVIDIA GeForce RTX 3070 Ti (0x00002482) Direct3D11 vs_5_0 ps_5_0, D3D11) |

Request Header Query Body **Cookies** Raw Summary +

| Key | Value |
| --- | --- |
| nautilus!mboxPC | e2100075349e4dfe923044029bf65f90.35_0 |
| nautilus!mboxSession | e2100075349e4dfe923044029bf65f90 |

80. The data discloses to Adobe that the user has viewed the page on the Defendant's website at the URL https://www.bowflex.com/product/velocore-22-exercise-bike/100914.html.

81. The data also discloses to Adobe, *inter alia*, the height, width, and orientation of the user's browser and screen.

82. The data further contains the "mboxMCGVID" parameter, which contains the ECID—the Adobe Experience Cloud ID (ECID).[37] "The ECID is a persistent identifier assigned to a user…."[38]

83. Further, along with all of this data, the Adobe software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information and IP address to be sent to Adobe.

**5. Salesforce Cookies.**

84. Defendant also causes third-party cookies to be transmitted between its Websites' users' browsers and devices and the **p.cquotient.com** domain, even after users elect to reject all non-Strictly Necessary cookies, including all Targeting and Performance cookies, and opt out of the sale of user data.

85. The **p.cquotient.com** domain is associated with Salesforce, Inc., a multi-billion-dollar software company that provides software applications focused on sales, customer service, marketing automation, e-commerce, and analytics.[39] CQuotient is a "customer prediction platform" provided as an "analytic software that enables multi-channel retailers to understand their customers."[40] Originally a separate company, CQuotient has since been acquired by Salesforce and folded into its Commerce Cloud or Unified Commerce suite of software applications.[41] These applications now feature "powerful AI that proactively helps merchants with storefront setup and channel optimization[.]"[42] While the Commerce Cloud includes tools

[37] https://experienceleague.adobe.com/en/docs/id-service/using/implementation/setup-target.

[38] https://experienceleague.adobe.com/en/docs/experience-platform/tags/extensions/client/web-sdk/accessing-the-ecid.

[39] https://en.wikipedia.org/wiki/Salesforce.
[40] https://pitchbook.com/profiles/company/51447-34#overview.
[41] *Id.*
[42] https://www.salesforce.com/commerce/?cc=dwdcmain.

for e-commerce that allow users to purchase products from websites, it also includes an analytic component that observes user interactions with a website in real time to make "personalized offers" to users based on their behavior.[43]

86. These cookies allow Salesforce and CQuotient to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D. The Third Parties Intercept User Communications While in Transit.**

87. On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Websites. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

88. First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long HTML-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

89. Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Many websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[44] Third Party platforms encourage this redundant configuration and automatically

[43] https://www.salesforce.com/commerce/innovations/.

[44] For example, Google's server-to-server API is the **Google Ads Conversion API**. Facebook's is the **Meta Conversions API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action.[45] This deduplication occurs as the communications are received, before they are stored.

90. Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

91. Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

92. To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

93. For example, Meta (formerly Facebook) has publicly described its proprietary real-time stream processing platform that ingests data transmitted from users' devices and

[45] For example, Facebook recommends that websites use a "redundant setup" whereby "advertisers implement the Conversions API alongside their Meta Pixel." *See* "Handling Duplicate Pixel and Conversions API Events," available at https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events. Facebook confirms that its system automatically deduplicates events using various parameters included with the data, such as "event_id," "event_name," "fbp," and "external_id." *Id.*

websites, applies real-time transformations and personalization, and only thereafter stores the data in backend data warehouses, as illustrated in the following diagram created by Meta:[46]




94. As the diagram confirms, the data is sent from consumers' "Devices" and from the "Web," and then goes through the Stream Processing Pipelines ***before*** being stored in the data "Warehouse."

95. Meta's Stream Processing Pipelines perform a wide variety of real-time analytics, transformations, and AI and machine learning on the data prior to storage:[47]

[46] XStream: Stream Processing Platform at Facebook (video) at 1:07 (available at https://www.youtube.com/watch?v=DNI54vc1ALQ).
[47] *Id.* at 2:05.




96. As the diagram confirms, Meta does not merely store incoming data for later review; rather, before the data is stored, Meta contemporaneously reads and processes it—including by reading the data, cleaning it, applying "real-time personalization" to associate it with a particular user, and analyzing its contents as necessary to generate real-time responses.

97. On information and belief, the other Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[48] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[49] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, ***transform the data***, and write the data to a destination."[50] One use for Dataflow

---

[48] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.

[49] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.

[50] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).

is the "[r]eal-time machine learning (ML) analysis of streaming data."[51] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[52]

98. Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating, filtering, and analyzing them in real time while those communications are in transit between the user's browser and Defendant's Websites.

**E. The Private Communications Collected are Valuable.**

99. As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiff's and other of the California Websites' users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiff and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

100. The Private Communications tracked and collected through cookies on the Websites are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular fitness equipment and then target those users with advertisements for similar products both on the Websites and across unrelated third-party websites.

101. Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader fitness equipment market.

---

[51] *Id.*
[52] *Id.*

Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

102. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Websites can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[53] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

103. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell their data or the consumer's willingness to pay to protect their information.

104. By falsely representing consumers' ability to decline non-Strictly Necessary cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFF'S EXPERIENCES

105. Plaintiff visited the BowFlex Website to seek and obtain information about Defendant's products, while located in California, on one or more occasions during the last four years.

106. Plaintiff's visits to the BowFlex Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff is not a consumer advocate, a "tester," or a compliance auditor that visited the BowFlex Website to test or evaluate Defendant's privacy practices.

[53] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

107. When Plaintiff visited the BowFlex Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Manage Cookies / Do Not Sell My Personal Information" link. Plaintiff viewed Defendant's representation on the popup cookie consent banner that, "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners." Plaintiff also viewed Defendant's additional representation that, rather than choosing to "Accept Cookies," users could instead "Manage Cookies / Do Not Sell My Personal Information."

108. On clicking or selecting the "Manage Cookies / Do Not Sell My Personal Information" link, Plaintiff was then directed to Defendant's "Cookie Overview" window. There, Defendant further represented that, "we store cookies on your browser to collect information. The information collected might relate to you, your preferences or your device, and is mostly used to make the site work as you expect it to and to provide personalized content, including ads. Below you can choose not to allow certain types of cookies, some of which may be 'sales' under California law. However, you cannot opt-out of our First Party Strictly Necessary Cookies…" Accordingly, Plaintiff saw that he could adjust toggle switches associated with all non-Strictly Necessary cookies in use on the BowFlex Website, including all "Targeting Cookies / Sale of Personal Data" and "Performance Cookies," other than "Strictly Necessary Cookies," which were "Always Active" and could not be rejected.

109. Plaintiff then switched off the toggles associated with "Targeting Cookies / Sale of Personal Data" and "Performance Cookies." Plaintiff believed that selecting or clicking the "Manage Cookies / Do Not Sell My Personal Information" link on the popup cookie consent banner found on the BowFlex Website would allow him to opt out of, decline, and/or reject all non-Strictly Necessary cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising,

and performance and traffic analytics), as well as the sale or sharing of his personal data. Plaintiff then confirmed his cookie choices by clicking or selecting the "Confirm My Choices" button.

110. In selecting the "Manage Cookies / Do Not Sell My Personal Information" link and switching off the toggles presented in the Cookie Overview window, Plaintiff gave Defendant notice that he did not consent to the use or placement of non-Strictly Necessary cookies and tracking technologies while browsing the BowFlex Website. Further, Plaintiff specifically rejected, based on Defendant's representations, those cookies used to "analyze performance and traffic on [the] [W]ebsite[s][,]" share users' personal information with third parties, including Defendant's "social media, advertising and analytics partners[,]" and "provide personalized content, including ads." In reliance on these representations and promises, only then did Plaintiff continue browsing the BowFlex Website.

111. Even before the popup cookie consent banner appeared on the screen, Defendant caused cookies and tracking technologies, including those used for personalized content, advertising, and performance and traffic analytics, to be placed on Plaintiff's device and/or transmitted to the Third Parties along with user data, without Plaintiff's knowledge. Accordingly, the popup cookie consent banner and Cookie Overview window's representations to Plaintiff that he could reject the use and/or placement of all non-Strictly Necessary cookies and tracking technologies while he browsed the BowFlex Website was false. Contrary to what Defendant made Plaintiff believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

112. Then, as Plaintiff continued to browse the BowFlex Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the Third Parties' cookies, including those used for personalized content, advertising, and performance and traffic analytics, to be placed on his device and/or transmitted to the Third Parties along with his user data. In doing so, Defendant permitted the Third Parties

to track and collect Plaintiff's Private Communications as Plaintiff browsed the BowFlex Website.

113. Defendant's representations that consumers could "Manage Cookies / Do Not Sell My Personal Information" and opt out of or reject all non-Strictly Necessary cookies while Plaintiff and users browsed the BowFlex Website, or at least those involved in providing personalized content, advertising, and performance and traffic analytics, were untrue. Had Plaintiff known this fact, he would not have used the BowFlex Website. Moreover, Plaintiff reviewed the popup cookie consent banner and Cookie Overview window prior to using the BowFlex Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-Strictly Necessary cookies, Plaintiff would have noticed it and would not have used the BowFlex Website or, at a minimum, he would have interacted with the BowFlex Website differently.

114. Plaintiff continues to desire to browse content featured on the BowFlex Website. Plaintiff would like to browse websites that do not misrepresent that users can reject all non-Strictly Necessary cookies and tracking technologies, as well as opt out of the sale and sharing of personal data. If the BowFlex Website were programmed to honor users' requests to reject all non-Strictly Necessary cookies and tracking technologies, Plaintiff would likely browse the BowFlex Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the BowFlex Website. Because Plaintiff does not know how the BowFlex Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the BowFlex Website honors users' requests to reject all non-Strictly Necessary cookies and tracking technologies, Plaintiff will be unable to rely on Defendant's representations when browsing the BowFlex Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the BowFlex Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine

what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

115. Plaintiff brings this Class Action Complaint on behalf of himself and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed one or more of Defendant's Websites in the State of California after switching off the toggle switches in the Cookie Overview window.

116. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

117. **Numerosity:** Plaintiff does not know the exact size of the Class, but he estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

118. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each Class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all non-Strictly Necessary cookies and tracking technologies on the Websites, as well as opt out of the sale or sharing of their personal data, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Websites.

119. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiff and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

120. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, Plaintiff, like the other Class members, visited the Websites, rejected non-Strictly Necessary cookies, and had his confidential Private Communications intercepted by the Third Parties.

121. **Adequacy of Representation:** Plaintiff will fairly and adequately protect the interests of all Class members because it is in his best interests to prosecute the claims alleged herein to obtain full compensation due to him for the unfair and illegal conduct of which he complains. Plaintiff also has no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and those of the Class. By prevailing on his claims, Plaintiff will establish Defendant's liability to all Class members. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

122. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an

important public interest will be served by addressing the matter as a class action. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

123. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

124. To plead an invasion of privacy claim, Plaintiff must allege an invasion of (i) a legally protected privacy interest; (ii) where Plaintiff had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

125. Defendant has intruded upon the following legally protected privacy interests of Plaintiff and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; and (iii) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense."

126. Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could reject all non-Strictly Necessary cookies and tracking technologies, including all Targeting and Performance cookies, and opt out of the sale of user data before proceeding to browse the Websites. Plaintiff and other Class members directed their electronic devices to access the Websites and, when presented with the popup cookie consent banner and Cookie Overview window on the Websites, Plaintiff and Class members rejected all non-Strictly Necessary cookies, including all Targeting and Performance cookies, and reasonably expected that his and their rejection of non-Strictly Necessary cookies and tracking technologies would be honored. That is, he and they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Websites. Plaintiff and Class members also reasonably expected that, if they rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiff's and Class members' Private Communications, including their browsing history, visit history, website

interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Websites.

127. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

128. Defendant, in violation of Plaintiff's and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed the Third Parties to collect enables them—and they in fact do—to, *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles with unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiff's and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

129. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications) and violated criminal laws on wiretapping and invasion of privacy. This intrusion into Plaintiff's privacy constitute an egregious breach of social norms that is highly offensive to a reasonable person.

130. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

131. Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

132. Plaintiff and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's and Class members' privacy.

133. Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' rejection of the Websites' use of non-Strictly Necessary cookies, and their choice to opt out of the sale or sharing of personal data. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

134. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

135. To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

136. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiff's and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device

information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner and Cookie Overview window, Defendant intentionally intruded upon the solitude or seclusion of its Websites' users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

137. The Third Parties' tracking and collecting of Plaintiff's and the Class members' Private Communications on the Websites using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiff and Class members, and, in fact, those Websites' users specifically chose to reject all non-Strictly Necessary cookies, including all Targeting and Performance cookies and opt out of the sale of user data.

138. Plaintiff and the Class members had an objectively reasonable expectation of privacy surrounding his and their Private Communications on the Websites based on Defendant's promise that users could reject all non-Strictly Necessary cookies, including all Targeting and Performance cookies, and opt out of the sale of user data as well as state criminal and civil laws designed to protect individual privacy.

139. Defendant's intentional intrusion into Plaintiff's and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that the Websites' users could reject all non-Strictly Necessary cookies, including all Targeting and Performance cookies, and opt out of the sale of user data when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies and opted out of all such data sales or sharing. Indeed, Plaintiff and Class members reasonably expected, based on Defendant's false representations, that when he and they rejected all non-Strictly Necessary cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on his and their devices or permit the Third Parties to obtain their Private Communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device

information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

140. Defendant's conduct was intentional and intruded on Plaintiff's and users' Private Communications on the Websites.

141. Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

142. Plaintiff and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's and Class members' privacy.

143. Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' rejection of the Websites' use of non-Strictly Necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Third Cause of Action</u>: Wiretapping in Violation of the California Invasion of Privacy Act ("CIPA") (California Penal Code § 631)**

144. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

145. California Penal Code § 631(a) provides, in pertinent part:

> Any person [i] who, by means of any machine, instrument, or contrivance, or in any other manner intentionally taps … or [ii] who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . .

146. Defendant is a "person" within the meaning of California Penal Code § 631.

147. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—

constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

148. Each of the Third Parties is a separate legal entity that offers software-as-a-service products and not merely a passive device. Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiff and Class members, on the one hand, and Defendant, on the other.

149. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

150. At all relevant times, the Websites caused Plaintiff's and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiff's and Class members' consent. By configuring the Websites in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiff and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

151. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

152. The Private Communications of Plaintiff and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly

communicate the Websites' users' affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

153. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

154. Plaintiff and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class members' electronic communications. Nor did Plaintiff and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiff and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic communications by rejecting non-Strictly Necessary cookies in the Cookie Overview window.

155. The wiretapping of Plaintiff and Class members occurred in California, where Plaintiff and Class members accessed the Websites and where the Third Parties—as caused by Defendant—routed Plaintiff's and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiff's California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

156. Plaintiff and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of his and their right to privacy, (ii) loss of value in his

and their Private Communications, (iii) damage to and loss of Plaintiff's and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

157. Pursuant to California Penal Code § 637.2, Plaintiff and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

158. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant. Plaintiff, Class members, and the general public continue to be at risk because Plaintiff, Class members, and the general public frequently use the Internet to search for information and content related to fitness equipment. Plaintiff, Class members, and the general public continue to desire to use the Internet for that purpose. Plaintiff, Class members, and the general public have no practical way to know whether their requests to reject non-Strictly Necessary cookies and tracking technologies, as well as opt out of the sale or sharing of personal data, will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

159. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

160. Defendant fraudulently and deceptively informed Plaintiff and Class members that he and they could "Manage Cookies / Do Not Sell My Personal Information," including all those Targeting and Performance cookies that "analyze performance and traffic on [the] [W]ebsite[s][,]" share users' personal information with Defendant's "social media, advertising and analytics partners[,]" and "provide personalized content, including ads."

161. However, despite Defendant's representations otherwise, Defendant caused such third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users adjusted the available toggle switches in the Cookie Overview window to reject all such cookies, and opt out of the sale or sharing of user personal data. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' Private Communications, even when consumers had previously chosen to reject all such cookies and opt out of all such sales or sharing.

162. Defendant affirmatively chose to deploy a cookie consent banner governing the collection, sharing, and use of users' Private Communications on the Websites.

163. By implementing the cookie banner, Defendant undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices.

164. Defendant and/or its agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms, tag-management rules, and related implementation choices under Defendant's control. On information and belief, Defendant operated, controlled, configured, approved, or maintained settings that permitted the Third Parties' tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to disable and/or reject all non-Strictly Necessary cookies, including all Targeting and Performance cookies, and opt out of the collection, use, sale, and/or sharing of their Private Communications.

165. Industry documentation for the consent management platforms and Third Parties' technologies used on the Websites explains that website operators, i.e., Defendant, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendant received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the Websites. On information and belief, Defendant had the ability during the relevant time period

to audit, test, configure, disable, or modify the cookie consent banner, consent-management functionality, and third-party tracking technologies operating on the Websites. Defendant had information available to it demonstrating that users' purported opt-out selections were not being honored and that users' Private Communications continued to be collected and transmitted to the Third Parties notwithstanding Defendant's contrary representations.

166. Defendant also used the Third Parties' analytics, advertising, and reporting dashboards to monitor the Websites' traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendant had access to information reflecting that user data continued to be transmitted to and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendant routinely reviewed, monitored, and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

167. Industry standards, privacy frameworks, and applicable statutes and regulations, including the California Consumer Privacy Act and its implementing regulations, require website operators deploying cookie consent banners to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See*, *e.g*., California Privacy Rights Act, Cal. Code Regs. tit. 11, § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id*. § 7101 (business record keeping requirements regarding opt out requests).

168. On information and belief, Defendant either knew its representations regarding users' ability to reject all non-Strictly Necessary cookies, including all Targeting and Performance cookies, and opt out of data sharing were false, lacked any reasonable basis for believing those representations were true, or made those representations carelessly and recklessly despite information available to Defendant demonstrating that users' data continued to be collected and transmitted to the Third Parties after users attempted to opt out.

169. The true facts were known exclusively to, and actively concealed by, Defendant, were not reasonably known to Plaintiff and Class members, and were material at the time they

were made. Defendant's misrepresentations and omissions concerned material facts that were essential to Plaintiff's and Class members' decisions as to whether to use the Websites. In misleading Plaintiff and Class members and not so informing them, Defendant breached its duty to Plaintiff and Class members. Defendant also gained financially from, and as a result of, its breach.

170. Plaintiff and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

171. Plaintiff and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's deceptive and/or unlawful practices, including the unauthorized interception of his and their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiff and Class members have also suffered harm in the form of diminution of the value of his and their private and personally identifiable information and communications.

172. Defendant's actions caused damage to and loss of Plaintiff's and Class members' property right to control the dissemination and use of their personal information and communications.

173. Defendant's representation that consumers could reject non-Strictly Necessary cookies (including all those cookies and similar technologies used to "analyze performance and traffic on [the] [W]ebsite[s][,]" share users' personal information with Defendant's "social media, advertising and analytics partners[,]" and "provide personalized content, including ads") if they adjusted the available toggle switches in the Cookie Overview window was false. Again, had Plaintiff and Class members known these facts, they would not have used the Websites. Moreover, Plaintiff and Class members reviewed the popup cookie consent banner and Cookie Overview window prior to their interactions with the Websites. Had Defendant disclosed that it caused third-party non-Strictly Necessary cookies to be stored on the Websites' visitors' devices

used for personalized content, advertising, performance and traffic analytics, and/or for the sale or sharing of information with third parties, even after they choose to reject all such non-Strictly Necessary cookies, Plaintiff and Class members would have noticed it and would not have interacted with the Websites, or at a minimum, would have interacted with the Websites differently.

174. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiff and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiff and Class members to, without limitation, use the Websites under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject all non-Strictly Necessary cookies. As a result, Plaintiff and the Class provided more personal data than they would have otherwise.

175. Plaintiff and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

176. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiff and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

177. Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' rejection of the Websites' use of non-Strictly Necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Fifth Cause of Action</u>: Unjust Enrichment**

178. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

179. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

180. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could reject all non-Strictly Necessary cookies, including

all Targeting and Performance cookies, and opt out of the sale of user data and by permitting the Third Parties to store and transmit cookies on Plaintiff's and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected such cookies.

181. Plaintiff and Class members' Private Communications have conferred an economic benefit on Defendant.

182. Defendant has been unjustly enriched at the expense of Plaintiff and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

183. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiff and Class members conferred on Defendant to his and their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiff and Class members.

184. It would be unjust for Defendant to retain the value of Plaintiff's and Class members' property and any profits earned thereon.

185. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

186. Plaintiff and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiff and Class members to the position he and they occupied prior to having his and their Private Communications tracked and collected by the Third Parties.

187. Plaintiff pleads this claim separately and in the alternative to his other claims, to the extent Plaintiff lacks an adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiff, on behalf of himself and the Class members, respectfully requests judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiff's counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiff and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, and fraudulent conduct alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of all issues so triable.

///

Dated: November 10, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*

Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiff*

# EXHIBIT A

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Claimant*

JAMS

SAN FRANCISCO REGIONAL OFFICE

| | |
|---|---|
| TERRY DEAN MYERS,<br><br>Claimant,<br><br>v.<br><br>JOHNSON HEALTH TECH RETAIL, INC.,<br><br>Respondent. | Arbitration Case No.<br><br>COMPLAINT AND DEMAND FOR ARBITRATION |

Claimant Terry Dean Myers ("Claimant") brings this action against Johnson Health Tech Retail, Inc. ("Respondent" or "Bowflex"). Claimant's allegations against Boxflex are based upon information and belief and upon investigation of Claimant's counsel, except for allegations specifically pertaining to Claimant, which are based upon Claimant's personal knowledge. Claimant files this Complaint and Arbitration Demand without waiver of any right or argument, specifically, and without limitation, that he did not assent to the Bowflex website's Terms of Use, including the arbitration agreement contained therein, and/or that the purported arbitration agreement is unlawful and/or unenforceable.

## INTRODUCTION

1. This Complaint and Arbitration Demand concerns one issue: whether a valid and enforceable arbitration agreement was formed between the parties to cover a separate dispute about Respondent's internet cookie practices that is not part of this Complaint nor at issue in this proceeding. For purposes of context, that underlying dispute relates to Claimant's visit to Respondent's website (www.bowflex.com, the "Website"), where despite Claimant's agreement

with Respondent that it would not place tracking cookies on his device, Respondent proceeded to do so anyway.[1] As is relevant to the instant dispute, the Website also contains Terms of Use ("TOU" or "Terms") with an arbitration provision purporting to require "all disputes, controversies, or claims" between website visitors and Respondent to be resolved by binding arbitration. Claimant contends that no agreement to arbitrate was ever formed. Respondent contends that the arbitration provision in the TOU is applicable to the underlying dispute and refused to consent to litigate the underlying dispute in federal court. Accordingly, he filed this arbitration demand to seek a declaration from the arbitrator that his underlying cookie dispute with Respondent is not subject to arbitration.

2. The Website's TOU are available on the Website but accessible only via an inconspicuous link displayed in small font at the bottom of the Website after all the main content. Moreover, Respondent does not require Website users to read or agree to the Terms before browsing the Website.

3. When Claimant visited the Website, he did not see or otherwise assent to the TOU before clicking the "Manage Cookies / Do Not Sell My Personal Information" link, reviewing the Cookie Overview window and using the Manage Consent Preferences section to toggle off/reject all "Targeting Cookies / Sale of Personal Data" and "Performance Cookies" and then continuing to browse the Website. Nor could he have done so. When users visit the Website, Respondent immediately displays a cookie pop up banner that ***obscures*** the Website's main content until users make a cookies selection on the banner. Because it is impossible for a Website user to view the link to the TOU, much less the TOU themselves, without first entering into an agreement with Respondent to accept or refuse cookies, Claimant could not—and did not—assent to the TOU. Accordingly, Claimant made no agreement to arbitrate his underlying cookie dispute.

[1] Respondent owns other brand websites, including, schwinnfitness.com. Respondent engaged in the same underlying unlawful conduct regarding the placement of internet cookies on the website.

**BACKGROUND ON THE UNDERLYING COOKIE DISPUTE**

4. This underlying dispute in this matter concerns an egregious privacy violation and total breach of consumer trust in blatant violation of California law. The Website is configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Website.

5. However, at least until placed on notice by Claimant,[2] the Website presented all visitors immediately with a cookie pop-up banner indicating that, rather than accepting all cookies, users can click the button to manage their cookie preferences.




(Screenshot of the Bowflex Website cookie popup banner.)

6. Users who selected the "Manage Cookies / Do Not Sell My Personal Information" link were directed to a "Cookie Overview" window, where Respondent represented that users could "choose not to allow certain types of cookies" by using the Manage Consent Preferences tool to toggle off/reject all "Targeting Cookies / Sale of Personal Data" and "Performance Cookies." Toggling off these cookies indicates the users' choice/agreement to reject all cookies, except the "Strictly Necessary Cookies," which users could not reject. Thousands of visitors to the Website, including Claimant, did just that—they selected the "Manage Cookies / Do Not Sell My Personal Information" link, reviewed the Cookie Overview window and used the Manage Consent Preferences tool to toggle off/reject all Targeting Cookies / Sale of Personal Data and Performance Cookies, and then proceeded to browse the Website.

7. Unbeknownst to Claimant and other users, however, Respondent nonetheless caused cookies—both from Respondent and third parties with notorious privacy records, including Alphabet Inc. (Google), Meta Platforms, Inc. (Facebook), Adobe Inc. (Omtrdc), and Salesforce, Inc. (Cquotient), among others—to be stored on the devices and browsers of

[2] On or about September 30, 2025, Claimant notified Respondent of its ongoing invasions of privacy and alleged violations of law, as described herein, as required under California's Consumers Legal Remedies Act, Cal. Civil Code §§ 1750 *et seq*., and Consumer Privacy Rights Act, Cal. Bus. & Prof. Code §§ 1798, *et seq*.

Claimant and those similarly situated despite their rejections of all cookies. As a result, Respondent caused the sharing, and ultimately the sale, of broad swaths of personal data about Claimant, and similar users, to undisclosed third parties, contrary to Respondent's representations and Claimant's express directions. Respondent brings this arbitration solely to establish that the separate cookie dispute is not arbitrable.

## PARTIES

8. Claimant Terry Dean Myers is, and was at all relevant times, an individual and resident of San Ramon, California. Claimant intends to remain in California and makes his permanent home there.

9. Respondent Johnson Health Tech Retail, Inc. has global headquarters in Taichung, Taiwan, but its North American headquarters and principal place of business is in Cottage Grove, Wisconsin.

## SUBSTANTIVE ALLEGATIONS

### A. Respondent's Unenforceable Browsewrap Agreement.

10. Respondent's Website includes a TOU that purports to govern the use of the Website. *See* TOU ("Johnson Health Tech Trading, Inc., and our subsidiaries and affiliates (collectively, 'JHT', 'we' or 'us') provide a variety of products, services, content and features through our various brands … through our equipment interfaces, mobile and desktop or device applications … and through certain JHT controlled social media pages (including on Facebook, Instagram, Spotify and Twitter) that post a link to, reference, or include this Terms of Use (collectively, the 'Service'). By registering with us, or by visiting, browsing, or using the Service in any way, you signify your agreement to all terms and conditions contained or referenced herein. If you do not agree to these Terms of Use ('Terms') please do not use the Service. JHT reserves the right to change these Terms, and your continued use of the Service constitutes agreement to all such changes."). It is located at the following address: https://www.bowflex.com/global-assets/legal/terms-of-use.html.

11. Page 5, paragraph 11 of the TOU purports to require Website users to arbitrate all disputes with Respondent in JAMS. *See* Appendix A, TOU p. 5, ¶ 11 ("Except for matters

relating to the enforcement of our intellectual property rights, all disputes, controversies, or claims arising out of or relating in any way to the Service, your participation in any of the features available through them and/or your purchase of any products, content or services shall be finally resolved by as provided below… Any dispute or claim that is subject to arbitration but is not resolved by the pre-arbitration dispute process, shall be submitted to binding arbitration. The disputes and claims subject to arbitration will be resolved by a single arbitrator mutually agreed upon by you and JHT. If we cannot agree on an arbitrator, then an arbitrator shall be selected pursuant to Rule 12 of the JAMS Streamlined Arbitration Rules and Procedures.")

12. Claimant, however, did not assent to the TOU or the arbitration provision contained therein. An internet contract is valid only if the user takes some action to unambiguously manifest assent to the contract after the website has placed the user on actual notice of the terms of that contract or has put a reasonably prudent user on inquiry notice of those terms. Claimant never saw the TOU, or even the hyperlink to "Terms of Use," and thus had no actual notice that his continued browsing of the Website would be subject to an arbitration agreement.

13. Nor did the Website place Claimant on inquiry notice of the TOU because it failed to provide reasonably conspicuous notice of the TOU. Moreover, Claimant took no action, such as clicking a button or checking a box, that unambiguously manifested his assent to the TOU. The Terms on the Website are no more than an unenforceable browsewrap agreement.

14. When users visited the Website, Respondent immediately displayed to them a cookie pop up banner which prompted users to either click the "Manage Cookies / Do Not Sell My Personal Information" link or click an "Accept Cookies" button. The cookies pop up banner remains displayed, ***obscuring*** the Website's main content, until users make a selection on the banner. The cookies pop up banner made no mention of the Website's TOU, contained no link to the TOU, and did not require the user to manifest assent to the Terms.




(Screenshot Bowflex Website showing cookie banner obscuring main content.)

15. The only link to the TOU appeared in small font (identical to the surrounding font) at the bottom of the Website. Website users were unable to click the link to view Respondent's TOU before selecting to either click the "Manage Cookies / Do Not Sell My Personal Information" link or click an "Accept Cookies" button on the cookie pop up banner, as demonstrated by the screenshots below, because the popup banner itself obscured the Website, including the link to the TOU. Therefore, even if Website users scrolled down to the very bottom of the Website before making their selection on the cookies popup banner, it was ***impossible*** for users to read and assent to TOU prior to making a choice to click the "Manage Cookies / Do Not Sell My Personal Information" link or click the "Accept Cookies" button:







(Screenshots of the Bowflex Website (a) showing cookie banner obscuring link to TOU; and (b) showing same view of the Website after the user made a selection on the cookie banner.)

16. Website users, such as Claimant, who clicked the "Manage Cookies / Do Not Sell My Personal Information" link on the cookies banner to indicate their choice and/or agreement to manage cookies were directed to an additional "Cookie Overview" window. This window, like the cookies popup banner, made no mention of the TOU. On that window, users could

manage consent preferences by toggling off/rejecting "Targeting Cookies / Sale of Personal Data" and "Performance Cookies" as shown in the screenshot below.




BOWFLEX
Manage Consent Preferences
Strictly Necessary Cookies
Always Active
These cookies are necessary for the website to function and cannot be switched off in our systems. They are usually only set in response to actions made by you which amount to a request for services, such as setting your privacy preferences, logging in or filling in forms. You can set your browser to block or alert you about these cookies, but some parts of the site may not work properly if blocked.
Targeting Cookies / Sale of Personal Data
Performance Cookies
Confirm My Choices
Powered By CookiePro


BOWFLEX
Targeting Cookies / Sale of Personal Data
We may use certain third party cookies that collect information about your visits for analytics and to personalize your experience, including with targeted ads. Under certain circumstances, these may potentially be considered “sales” under the California Consumer Privacy Act (CCPA). Under the CCPA, consumers have the right to opt-out of the sale of personal information to third parties. You may opt out of the “sale” of personal information and from the use of targeting cookies on our website by turning off this toggle switch. If you use different computers or browsers, you may need to indicate your opt-out choices on each of those computers and browsers.
Targeting Cookies
These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of
Confirm My Choices
Powered By CookiePro







17. After making their selections in the Cookie Overview window, users could then continue to browse the Website, as the cookie pop up banner and Cookie Overview window disappeared.

18. Even setting aside the fact that the cookie pop-up banner blocks any ability to view the TOU, the link to the TOU itself at the bottom of the Website is not conspicuous. It is not, for example, in a different color, font or size from the surrounding text. Nor is it highlighted or emboldened relative to its surrounding text. Instead, it is very small and much less conspicuous than the images and text elsewhere on the Website. Moreover, it is not available on the Website when a user first visits; rather, they must scroll down to find it with no forewarning of being bound by the Terms.

19. Respondent never required Claimant to manifest consent to the TOU; it purports to bind users to the TOU simply by their continued use of the Website, which is legally insufficient even if the notice had been conspicuous.

**B. Claimant's Experiences**

20. During the last year, Claimant visited the Bowflex Website to browse products.

21. When Claimant visited the Bowflex Website, the Website immediately presented him with Respondent's cookie pop up banner as it appeared at the time.

22. Consistent with his typical practice in rejecting cookies and/or the sale of his personal data, Claimant selected and clicked the "Manage Cookies / Do Not Sell My Personal Information" link. Claimant was then presented with Respondent's Cookie Overview window then in effect at the time. Claimant toggled off/reject the "Targeting Cookies / Sale of Personal Data" and "Performance Cookies," before clicking "Confirm My Choices," thereby giving Respondent notice that he did not consent to the use or placement of third-party cookies. Further, Claimant specifically rejected those cookies that would enable the sale or sharing of his personal data. In reliance on these representations and promises, only then did Claimant continue browsing the Website.

23. Claimant did not see the TOU link—or the actual TOU—on the Website prior to rejecting all cookies, or at any point thereafter. Moreover, Claimant could not have seen the link to Respondent's TOU prior to clicking the "Manage Cookies / Do Not Sell My Personal Information" link and using the Cookie Overview window to reject cookies because—in addition to being hidden in small font at the very bottom of the Website—the cookies pop up banner

obscured the only link to the TOU on the Website. The cookies popup banner did not disappear until after Claimant made his cookies choices.

## CAUSE OF ACTION

### Declaratory Judgment that the Underlying Dispute is Not Subject to Arbitration

24. Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

25. The Bowflex Website's TOU purports to require arbitration of any and all disputes and to waive users' rights to bring a legal action, including a class action, in court. In particular, the TOU states the following:

> **BINDING ARBITRATION; CLASS ACTION WAIVER**
>
> Except for matters relating to the enforcement of our intellectual property rights, all disputes, controversies, or claims arising out of or relating in any way to the Service, your participation in any of the features available through them and/or your purchase of any products, content or services shall be finally resolved by as provided below. YOU ARE GIVING UP THE RIGHT TO LITIGATE A DISPUTE WITH JHT BEFORE A JUDGE OR JURY. The arbitral tribunal shall have the power to rule on any challenge to its own jurisdiction or to the validity or enforceability of any portion of this agreement to arbitrate. You and JHT agree to arbitrate solely on an individual basis and expressly waive the ability to participate in a class or representative proceeding, including any class arbitration or representative arbitration proceedings. The arbitral tribunal may not consolidate more than one person's claims and may not otherwise preside over any form of a representative or class proceeding in the event the prohibition on class arbitration is deemed invalid or unenforceable than the remaining portions of the agreement to arbitration will remain in force. To the extent that you or JHT opts out of arbitration following the procedure set forth below, or if this arbitration agreement is found inapplicable to a dispute between us, you and JHT expressly waive the ability to participate in any class or representative litigation.
>
> If a dispute arises that is subject to arbitration, you must give us written notice and an opportunity to resolve it. Your notice must include your name, your address, a written description of the dispute, and a specific description of the relief you are seeking. If we do not resolve our dispute within forty-five (45) days after receiving your notice, you may pursue arbitration as below by sending a written demand for arbitration to us at the address set forth below in "QUESTIONS."
>
> Any dispute or claim that is subject to arbitration but is not resolved by the pre-arbitration dispute process, shall be submitted to binding arbitration. The disputes and claims subject to arbitration will be resolved by a single arbitrator mutually agreed upon by you and JHT. If we cannot agree on an arbitrator, then an arbitrator shall be selected pursuant to Rule 12 of the JAMS Streamlined Arbitration Rules and Procedures. The arbitrator shall be bound by and shall strictly enforce these Terms and any other applicable agreement between us, and may not limit, expand, or otherwise modify any such terms. The arbitrator may award any relief that a court of law could, applying the limitations of liability contained in these Terms.

> The arbitrator may award injunctive relief if permitted by law, but the injunctive relief awarded by the arbitrator may not extend beyond our dealings with one another. Any arbitration will be held in the city of Madison in Dane County, Wisconsin, U.S.A., unless otherwise agreed upon by you and JHT in writing. You and JHT will each bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator shall award costs and fees to the prevailing party if it is determined that the other party submitted a claim with no reasonable basis or filed any claim in bad faith.
>
> You may opt out of the agreement to arbitrate by providing written notice of your intention to do so to us at the address below no later than 60 days after initial acceptance of these Terms. The procedure spelled out herein is the only way to opt out of arbitration, and any attempts to opt out after the deadline set forth herein will be ineffective. Notwithstanding your decision to opt out of arbitration, you still waive the ability to participate in any class or representative litigation.
>
> Because the Service and these Terms concern interstate commerce, the Federal Arbitration Act governs the interpretation and enforcement of the arbitration rules (notwithstanding the application of Wisconsin law to any underlying claims as provided above). You agree the arbitration and other provisions of this section "Binding Arbitration; Class Action Waiver" survives any termination of these Terms.

TOU (available at hhttps://www.bowflex.com/global-assets/legal/terms-of-use.html).

26. Claimant did not view, and did not have actual notice of, Respondent's TOU, including the arbitration provision contained therein.

27. The link to the TOU was inconspicuous and failed to provide reasonably prudent users such as Claimant with actual notice that his continued use of the Website would subject him to the TOU.

28. It was impossible for Claimant to view the hyperlink to the TOU and/or review the Terms prior to rejecting all cookies because the cookies pop up banner obscured the hyperlink to the TOU as described above.

29. Respondent did not require users such as Claimant to manifest their unambiguous assent to the TOU by clicking a button or checking a box.

30. Claimant, therefore, had no notice, constructive or otherwise, of the TOU and never assented to them.

31. Because Claimant did not assent to the Terms, Claimant is entitled to, and seeks, a declaration that the arbitration provision and class action waiver contained in the TOU are unenforceable and that the underlying dispute described herein is not subject to arbitration.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

32. An order declaring that Claimant did not assent to Respondent's TOU and that the underlying dispute described herein is not subject to arbitration;

33. For reasonable attorneys' fees and the costs incurred; and

34. For such further relief as may be just and proper.

Dated: November 14, 2025

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Claimant*

# EXHIBIT B

JAMS

# NOTICE OF INTENT TO INITIATE ARBITRATION

NOTICE TO ALL PARTIES December 4, 2025

RE: **Myers, Terry Dean vs. Johnson Health Tech Retail, Inc.**
Reference #: 5100003673

Dear Parties:

JAMS has received a Demand for Arbitration in the above-referenced matter pursuant to a mandatory pre-dispute arbitration clause contained in a contract between the parties.

Pursuant to the parties' pre-dispute arbitration agreement and JAMS policy, this arbitration shall be conducted in accordance with the JAMS Streamlined Arbitration Rules & Procedures. It is important to familiarize yourself with the arbitration rules. A copy of these rules can be obtained by visiting our website at www.jamsadr.com. Please note that this matter, being filed by a consumer against a company, will be further governed by JAMS Minimum Standards of Procedural Fairness in Consumer Arbitrations.

Claimant has paid $250.00 of the non-refundable Filing Fee. Under JAMS Minimum Standards, the Consumer will only be required to pay a maximum of $250.00 of the Filing Fee. All other fees associated with this Arbitration shall be borne by the company/non-consumer party. Thus, Respondent must pay the remaining $1,750.00 of the non-refundable Filing Fee. Payment is due upon receipt. **Please note that California Code of Civil Procedure sections 1281.97 – 1281.99 may apply to the payment of fees for this arbitration.**

Under appropriate circumstances, the Arbitrator may award JAMS fees and expenses against any party. JAMS agreement to render services is not only with the parties, but extends to the attorneys or other representatives of the parties in arbitration.

Upon receipt of the balance of the Filing Fee from Respondent, JAMS will formally commence this matter and proceed with the arbitrator selection process.

Contact me at 408-346-0736 or cvictory@jamsadr.com if you have questions.

Sincerely,
*Cynthia S. Victory*
Cynthia S. Victory
Arbitration Practice Consultant
cvictory@jamsadr.com

Enclosures

JAMS®

# RETAINER

**Invoice Date**
12/4/2025

**Invoice Number**
8000298

Bill To: **Attn. Legal Department**
**Johnson Health Tech Retail, Inc.**
**1600 Landmark Drive**
**Cottage Grove, WI 53527**
**US**

| **Reference #:** | **5100003673 - Rep# 4** |
|---|---|
| Billing Inquiries: | **Victory, Cynthia S** |
| Email: | **cvictory@jamsadr.com** |
| Telephone: | **408-346-0736** |
| Employer ID: | **68-0542699** |

RE: **Myers, Terry Dean vs. Johnson Health Tech Retail, Inc.**
Representing: **Johnson Health Tech Retail, Inc.**

Neutral(s): **JAMS 1-JAMS**
Hearing Type: **ARBITRATION** CSV

| Date / Time | Description | Your Share |
|---|---|---|
| 12/4/25 | **JAMS INC**<br>Non-Refundable Filing Fee | $ 1,750.00 |

| | |
|---|---|
| **Total Billed:** | $ 1,750.00 |
| **Total Payment:** | $ 0 |
| **Balance:** | $ 1,750.00 |

Invoice total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc. Payment is due upon receipt.

**Click here to pay**

Standard mail:
**P.O. Box 845402**
**Los Angeles, CA 90084**

Overnight mail:
**18881 Von Karman Ave. Suite 350**
**Irvine, CA 92612**

# EXHIBIT C

# FINAL REQUEST FOR FILING FEE FROM RESPONDENT

NOTICE TO ALL PARTIES December 23, 2025

Re: **Myers, Terry Dean vs. Johnson Health Tech Retail, Inc.**
Reference #: 5100003673

Dear Parties:

Please be advised that JAMS has not received the non-refundable Filing Fee from the Respondent party as previously requested. If the non-refundable Filing Fee of $1,600.00 is not received within 30 days, JAMS will close the file. This date is not intended to and does not extend the due date for payment of the outstanding invoice(s). The outstanding invoice(s) was due upon receipt. **Please note that California Code of Civil Procedure sections 1281.97 – 1281.99 may apply to the payment of fees for this arbitration.**

Contact me at 408-346-0736 or cvictory@jamsadr.com if you have questions.

Sincerely,

Cynthia S. Victory

Cynthia S. Victory
Arbitration Practice Consultant
cvictory@jamsadr.com

Enclosure:

JAMS®

# RETAINER

**Invoice Date**
12/4/2025

**Invoice Number**
8000298

Bill To: **Attn. Legal Department**
**Johnson Health Tech Retail, Inc.**
**1600 Landmark Drive**
**Cottage Grove, WI 53527**
**US**

| | |
|---|---|
| **Reference #:** | **5100003673 - Rep# 4** |
| Billing Inquiries: | **Victory, Cynthia S** |
| Email: | **cvictory@jamsadr.com** |
| Telephone: | **408-346-0736** |
| Employer ID: | **68-0542699** |

RE: **Myers, Terry Dean vs. Johnson Health Tech Retail, Inc.**
Representing: **Johnson Health Tech Retail, Inc.**

Neutral(s): **JAMS 1-JAMS**
Hearing Type: **ARBITRATION** CSV

| Date / Time | Description | Your Share |
|---|---|---|
| 12/4/25 | **JAMS INC**<br>Non-Refundable Filing Fee | $ 1,750.00 |

| | |
|---|---|
| **Total Billed:** | $ 1,750.00 |
| **Total Payment:** | $ 0 |
| **Balance:** | $ 1,750.00 |

Invoice total is based on the fee split agreed upon by all parties. If the case cancels or continues, fees are due per our cancellation and continuance policy. Please make checks payable to JAMS, Inc. Payment is due upon receipt.

**Click here to pay**

Standard mail:
**P.O. Box 845402**
**Los Angeles, CA 90084**

Overnight mail:
**18881 Von Karman Ave. Suite 350**
**Irvine, CA 92612**

# EXHIBIT D

JAMS®

# NOTICE OF CLOSING FILE

NOTICE TO ALL PARTIES January 27, 2026

RE: **Myers, Terry Dean vs. Johnson Health Tech Retail, Inc.**
Reference #: 5100003673

Dear Parties:

This letter is to confirm the above referenced matter is closed as of January 27, 2026 due to non-payment of arbitration filing fees from Respondent.

Please contact me should you have any questions.

Sincerely,

Cynthia S. Victory

Cynthia S. Victory
Arbitration Practice Consultant
cvictory@jamsadr.com